IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

INTERNATIONAL TOBACCO
PARTNERS, LTD.                                                      PLAINTIFF

v.                    Civil No. 05-5065

MIKE BEEBE, in his official
capacity as Attorney General
of the State of Arkansas                                           DEFENDANT

O R D E R

Now on this 6th day of March, 2006, comes on for consideration **Defendant's Motion To Dismiss** (document #21), and from said motion, and the response thereto, the Court finds and orders as follows:

1. Plaintiff asserts antitrust and constitutional challenges to **A.C.A. §26-57-261**, as amended by **Act 384 of 2005** (the "Escrow Statute"), and to **A.C.A. §26-57-1303(c)** (the "Contraband Statute"). Count I of the Amended Complaint alleges that these statutes constitute illegal *per se* restraints of trade pursuant to **15 U.S.C. §1** (the "Sherman Act")[1]. Count II alleges that the retroactivity provision of the Escrow Statute violates both substantive and procedural due process rights under the Fourteenth Amendment of the United States Constitution. Count III alleges that the challenged statutes violate the Equal Protection Clause of the Fourteenth Amendment and plaintiff's

---

[1] A request for relief under 15 U.S.C. §26 (the "Clayton Act") is also added to the prayer for relief, although not stated in any of the Counts of the Amended Complaint.

First Amendment rights.

Defendant moves to dismiss these claims, taking the position that plaintiff has failed to state claims upon which relief can be granted.

2.  The applicable standard on a motion to dismiss for failure to state a claim is well settled:

> A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. A complaint must be viewed in the light most favorable to the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of the necessary factual allegations. Thus, as a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.

**Krentz v. Robertson Fire Protection District, 228 F.3d 897 (8th Cir. 2000)** (internal citations and quotation marks omitted).

Saying that a complaint must be viewed in the light most favorable to the plaintiff is not the same as saying that every allegation in the complaint must be treated as both factually true and necessary to the case. Under federal "notice pleading" guidelines, all that is needed in a well-pled complaint is

> (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks.

**F.R.C.P. 8(a).** In the instant case, the Amended Complaint is 37

pages long, and reads like a John Grisham novel. It is replete with hyperbolic statements[2] casting the defendant in a sinister role, and reams of detail not only unnecessary to the pleading, but detrimental to it, in the sense that they make it more difficult to determine exactly what is being complained of. Setting aside the hyperbole, and sorting through the unnecessary detail, the Court believes that the relevant allegations of the Amended Complaint may be fairly summarized[3] as follows:

* Plaintiff International Tobacco Partners, Ltd. ("International Tobacco") is an importer of tobacco products which does business in the State of Arkansas. It purports to bring this suit on behalf of itself and a class described as

> all firms throughout the United States that purchase cigarettes made by manufacturers that do not make MSA settlement payments, i.e., NPMs that in turn resell such cigarettes to the wholesalers and retailers that have Arkansas tax stamp licenses and resell such cigarettes in Arkansas as well as importers of cigarettes made by foreign manufacturers that do not belong to the MSA, who also sell cigarettes in Arkansas.

* In 1998, Arkansas, along with 45 other states and six

---

[2]A few examples will show the tenor of the pleading: "Joining the MSA would, of course, and still does, subject any manufacturer becoming an SPM to joint and several liability with the Majors for treble damages under the antitrust laws caused by the operation of the output cartel created" (¶31); "This unannounced and unanticipated application of the repealer of the A[llocable] S[hare] R[efund] to 2003 escrow fund payments was sprung like a trap and is clear evidence of the defendant's illegal intent <u>per se</u> under §1 of the Sherman Act not merely to discriminate against the NPMs but to wipe them out" (¶49); "the MSA output cartel has given a substantial boost to the activities of organized crime, which is the force behind such contraband sales." (¶78)

[3]In preparing this summary, the Court has set forth the actual text of statutes, rather than the summaries thereof contained in the Amended Complaint, and has omitted plaintiff's legal conclusions drawn from the factual allegations, inasmuch as it is the function of the Court on a motion to dismiss to determine whether the alleged facts - assuming them to be true - would warrant the conclusions posited.

territories (the "Settling States"), settled litigation seeking reimbursement for medical costs associated with tobacco use. The settlement was memorialized in a document entitled the Master Settlement Agreement ("MSA"), and the settling tobacco companies are generally referred to as "Original Participating Manufacturers" or "OPMs."

* After the MSA was signed, tobacco manufacturers who were not named defendants in the litigation were offered an opportunity to sign the MSA. Those who elected to sign are referred to as "Subsequent Participating Manufacturers" or "SPMs," and the entire group of signatories is referred to as "Participating Manufacturers" or PMs. Those manufacturers who elected not to sign the MSA are referred to as Nonparticipating Manufacturers or "NPMs." International Tobacco is an NPM.

* The MSA provides for annual payments by each OPM for the benefit of the Settling States. The amount of each such payment is based principally on the relative national market share of the OPM making the payment. The payments are divided among the Settling States based on a fixed formula that apportions the payment into what is referred to as each Settling State's "Allocable Share."

* SPMs who signed the MSA within 90 days of its original execution are exempt from making MSA payments, so long as their annual market share does not exceed their 1998 market share or

125% of their 1997 market share.

* The MSA contained incentives to the Settling States to enact statutes which would require NPMs (who were not subject to the payments required of PMs) to place money in escrow each year based on their market shares. In 1999, Arkansas enacted the Escrow Statute, codified at **A.C.A. §26-57-260 and 261**. As originally enacted, **A.C.A. §26-57-261** provided, in relevant part, as follows:

> Any tobacco product manufacturer selling cigarettes to consumers within the state . . . after the date of enactment of this section, shall do one (1) of the following:
>
> (1) Become a participating manufacturer, as that term is defined in section II(jj) of the Master Settlement Agreement, and generally perform its financial obligations under the Master Settlement Agreement; or
>
> (2)(A) Place into a qualified escrow fund by April 15 of the year following the year in question the following amounts. . . .
>
> (B) A tobacco product manufacturer that places funds into escrow pursuant to subdivision (a)(2)(A) of this section shall receive the interest or other appreciation on such funds as earned. Such funds themselves shall be released from escrow only under the following circumstances:
>
> (i) To pay a judgment or settlement on any released claim brought against such tobacco product manufacturer. . . .
>
> (ii) To the extent that a tobacco manufacturer establishes that the amount it was required to place into escrow in a particular year was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement, as determined pursuant to section IX(i)(2) of the Master

> Settlement Agreement and before any of the adjustments or offsets described in section IX(i)(3) of that agreement other than the inflation adjustment, had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer.
>
> ii) To the extent not released from escrow under subdivisions (a)(2)(A)(i) or (a)(2)(A)(ii) of this section, funds shall be released from escrow and revert back to such tobacco product manufacturer twenty-five (25) years after the date on which they were placed into escrow.

* **A.C.A. §26-57-261(2)(B)(ii)** was known as the "Allocable Share Refund" provision. It insured that an NPM would not pay more, under the Escrow Statute, than the amount Arkansas would have received from the manufacturer if it had been a PM.

* In 2003, Arkansas enacted the Contraband Statute, codified at **A.C.A. §26-57-1303.** The Contraband Statute requires a tobacco product manufacturer whose cigarettes are sold in Arkansas to certify to the Attorney General *either* that it is a PM, *or* that it is in full compliance with the Escrow Statute. The Contraband Statute also requires the Attorney General to publish a list of all certified manufacturers, and makes it illegal to traffic in the cigarettes of noncompliant manufacturers.

* In 2005, the Arkansas General Assembly amended the Allocable Share Refund provision. The amended statute (the "Allocable Share Amendment"), now codified at **§26-57-261(a)(2)(B)(ii),** provides in relevant part as follows:

> To the extent that a tobacco product manufacturer

establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the Master Settlement Agreement payments, as determined under section IX(i) of the Master Settlement Agreement including after final determination of all adjustments, that the manufacturer would have been required to make on account of the units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer. . . .

\*    The Escrow Statute and the Contraband Statute, working together, have the effect of an "output cartel" which will tend to eliminate competition from the NPMs.

\*    The payments required of NPMs under the Escrow Statute are not tax deductible, whereas the MSA payments of the PMs are tax deductible.

\*    International Tobacco and the other NPMs have not been charged with the misconduct which was alleged against the OPMs in the litigation.

\*    The purpose of the Contraband Statute and the Escrow Statute is to preserve supracompetitive revenues for the PMs, and corresponding MSA payments to the State, at the expense of the cigarette-smoking public.

\*    International Tobacco priced the cigarettes it sold in 2004 and the first quarter of 2005 on the basis that it would be entitled to the allocable share release as provided under the Escrow Statute before it was amended.

\*    The PMs have increased, rather than decreased, their advertising efforts since signing the MSA, and this advertising

has the effect of encouraging smoking by youths.

  * A flat tax would be a better way of achieving the various objectives of the MSA and its ancillary legislation.

  * The MSA and its ancillary legislation have not reduced the level of cigarette smoking.

  * Count I alleges that the Escrow Statute, in conjunction with the Contraband Statute, work together to create an "output cartel" which is an illegal *per se* restraint of trade under the Sherman Act.

  * Count II alleges that the retroactive application of the Allocable Share Amendment violates both substantive and procedural due process under the Fourteenth Amendment to the United States Constitution.

  * Count II alleges that enforcement of the Escrow and Contraband Statutes violates plaintiff's Equal Protection Rights under the Fourteenth Amendment and violates plaintiff's right to freedom of speech and freedom to petition under the First Amendment.

  3. Defendant first argues that plaintiff has failed to state a claim under the Sherman Act, because the challenged statute constitutes state action, which is *per se* immune from liability under the Sherman Act.

  Plaintiff argues that the Allocable Share Amendment creates a form of "hybrid restraint" of competition, an exception to the

state action doctrine. Its antitrust claim may be summarized thus: the effect of the MSA, as implemented by the Amended Allocable Share Refund provision, is to increase NPM costs, reduce pricing pressure on OPMs, and encourage PMs to reduce their output.

The Allocable Share Amendment is an act of the Arkansas Legislature, and as such, the Sherman Act issue is analyzed according to special rules that have developed over the years with regard to the antitrust effect of state statutes, and which make the acts of state sovereigns virtually immune to attack under federal antitrust provisions.

The state action immunity doctrine arose out of the case of **Parker v. Brown**, **317 U.S. 341 (1943),** wherein it was decided that the Sherman Act was directed to individual rather than state action, and was not violated by state regulatory programs. It was further developed in **Rice v. Norman Williams Co.**, **458 U.S. 654 (1982),** where the Court stated that

> [i]n determining whether the Sherman Act pre-empts a state statute, we apply principles similar to those which we employ in considering whether any state statute is pre-empted by a federal statute pursuant to the Supremacy Clause. As in the typical pre-emption case, the inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes. The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute. A state regulatory scheme is not pre-empted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the antitrust laws. A state statute is not pre-empted by

the federal antitrust laws simply because the state
scheme might have an anticompetitive effect.

        \*       \*       \*

Our decisions in this area instruct us . . . that a
state statute, when considered in the abstract, may be
condemned under the antitrust laws only if it mandates
or authorizes conduct that necessarily constitutes a
violation of the antitrust laws in all cases, or if it
places irresistible pressure on a private party to
violate the antitrust laws in order to comply with the
statute. Such condemnation will follow under §1 of the
Sherman Act when the conduct contemplated by the statute
is in all cases a *per se* violation. If the activity
addressed by the statute does not fall into that
category, and therefore must be analyzed under the rule
of reason, the statute cannot be condemned in the
abstract. Analysis under the rule of reason requires an
examination of the circumstances underlying a particular
economic practice, and therefore does not lend itself to
a conclusion that a statute is facially inconsistent
with federal antitrust laws.

**458 U.S. at 659-61.**

In **<u>324 Liquor Corp. v Duffy</u>, 479 U.S. 335 (1987),** the Court

noted that it had, over time, established a two-part test for

determining state action immunity under **<u>Parker</u>**:  the challenged

restraint must be "clearly articulated and affirmatively expressed

as state policy," and must be "actively supervised by the state

itself."  **479 U.S. at 343**.  Yet even those requirements do not

apply when the restraint under consideration is a state statute

rather than the act of a subdivision of state government:

In the years since the decision in *Parker*, the
Court has had occasion in several cases to determine the
scope of the state-action doctrine.  It has never
departed, however, from *Parker's* basic reasoning. . . .
If the replacing of entirely free competition with some

form of regulation or restraint was not authorized or
approved by the State then the rationale of *Parker* is
inapposite. As a result, in cases involving the
anticompetitive conduct of a nonsovereign state
representative the Court has required a showing that the
conduct is pursuant to a "clearly articulated and
affirmatively expressed state policy" to replace
competition with regulation. The Court also has found
the degree to which the state legislature or supreme
court supervises its representative to be relevant to
the inquiry. When the conduct is that of the sovereign
itself, on the other hand, the danger of unauthorized
restraint of trade does not arise. Where the conduct at
issue is in fact that of the state legislature or
supreme court, we need not address the issues of "clear
articulation" and "active supervision."

**Hoover v. Ronwin, 466 U.S. 558, 568-69 (1984)** (internal citations
omitted).

There is a limited exception to the state action immunity
doctrine, explained in **Fisher v. City of Berkeley, California, 475
U.S. 260 (1986)** as follows:

> Not all restraints imposed upon private actors by
> government units necessarily constitute unilateral
> action outside the purview of §1 [of the Sherman Act].
> Certain restraints may be characterized as "hybrid," in
> that nonmarket mechanisms merely enforce private
> marketing decisions. Where private actors are thus
> granted "a degree of private regulatory power," the
> regulatory scheme may be attacked under §1.

**475 U.S. at 267-68.**

Plaintiff suggests that the Allocable Share Amendment comes
within the purview of the hybrid restraint exception to the state
action immunity doctrine. It reasons that the MSA and its
ancillary legislation contain such incentives for tobacco
companies to increase their prices and keep their output levels

the same, that it has the same effect on the market as if those companies had formed an "output cartel."

The Court does not agree with the proposition that if the potential *effect* of a statute on the market is as though private parties had created an output cartel, the statute necessarily runs afoul of the Sherman Act. It is only in very limited circumstances that such occurs. **California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.**, **445 U.S. 97 (1980)**, illustrates the extremely narrow circumstances in which a state statute will be pre-empted by the Sherman Act. In **Midcal**, a California statute *required* liquor dealers to set prices and imposed fines on those who sold for less. The state had no direct control over the prices, and did not review the prices that were set. The Court held that the statute was pre-empted because it literally mandated price-fixing by private parties. In an oft-quoted passage, the Court stated that the "national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." **445 U.S. at 97**.

In **Midcal**, what the state did was essentially to bless private antitrust conduct and enforce violations. In the case at bar, there is no allegation that the Allocable Share Amendment mandates or authorizes price-setting or output fixing by private parties. Instead, plaintiff alleges that the effect of the

Allocable Share Amendment (in conjunction with the other statutes enacted pursuant to the MSA) is to cause or allow the PMs to conduct their business as though they were part of an output cartel.  The Amendment, however, does not on its face authorize, much less require, such behavior.  It simply establishes one aspect of the cost of doing business in Arkansas for those tobacco companies who have chosen not to participate in the regulatory scheme established by the MSA.  Individual tobacco companies remain free to raise or lower their prices or their output as they see fit, and there is, at worst, a hypothetical or potential conflict with federal antitrust law, not the irreconcilable conflict that would be required to invalidate the Amendment under federal anti-trust law.

For the foregoing reasons, the Court concludes that plaintiff can prove no set of facts under which the Allocable Share Amendment would be pre-empted by the Sherman Act, and the Motion To Dismiss will be granted as to that claim.

4.   Defendant next argues that plaintiff's freedom of speech claim should be dismissed.  The gravamen of plaintiff's First Amendment claim is that the challenged statutes impose penalties on it, and other NPMs, for refusing to waive their First Amendment rights.  Fleshed out, this argument appears to be (a) that because the Allocable Share Amendment requires an NPM to pay more into its Arkansas escrow account than the amount it would have to pay under

the MSA if it were a PM, its freedom of speech (maintained by not signing the MSA) is impermissibly burdened, and (b) that it is being coerced, or at least "needlessly encouraged," to waive certain free speech rights by economic pressure to sign the MSA.

These arguments are based on the fact that under the Allocable Share Amendment, an NPM's escrow payments for sales in Arkansas will be greater than the amount Arkansas would have received if the NMP were a PM. The argument, however, misses the point. The regulatory scheme is not so structured that it costs a tobacco manufacturer more to be an NPM than a PM. It does not require International Tobacco, or any other NPM, to pay more *per cigarette* into escrow than it would pay *per cigarette* under the MSA if it were a PM. The relevant text of the Amendment is this:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of **units sold in the state** in a particular year **was greater than the Master Settlement Agreement payments** . . . that the manufacturer would have been required to make on account of the units sold[4] had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer. . . .

**§26-57-261(a)(2)(B)(ii)** (emphasis added).

This differs from the Allocable Share Refund provision, which provided, in relevant part:

> To the extent that a tobacco manufacturer establishes that the amount it was required to place into escrow in

---

[4]"Units sold" is defined as "the number of individual cigarettes sold in the state by the applicable tobacco product manufacturer." A.C.A. §26-57-260.

a particular year **was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement** . . . had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer.

**A.C.A. §26-57-261(2)(B)(ii)** (emphasis added).

The distinction is illustrated in an explanation of how an NPM could use the original allocable share refund (or "allocable share release") provision to its advantage, found in **Freedom Holdings, Inc. v. Spitzer**, 2004 WL 2035334 (S.D.N.Y. 2004):

> In practical effect, the Allocable Share Release provision provided NPMs with substantial competitive advantages from concentrating their efforts on regional distribution. If an NPM distributed its cigarettes nationally, and its distribution patterns approximated those of the national market, its payment obligations on its national sales would be apportioned 100 percent among the settling states, with the result that something close to 100 percent of its payments would, in the aggregate, be retained under the Escrow Statute and not released under the Allocable Share Release provision. However, if an NPM were to concentrate its business to the New York--New Jersey--Connecticut area, for instance, it could gain a competitive advantage in that region, because it would make 100% of its sales there and would be able to recoup the payments on all but roughly 16.5% of them, these being approximately the percentage shares of those states. While the OPMs and SPMs would be required to continue 100% of their payments under the MSA, an NPM which focused on the New York metropolitan area could be exempt (aside from the time-value of its money between when it was escrowed and when it was released) to the extent of over 80% of its business.

When viewed in the context of the statutes at issue, it becomes clear that what International Tobacco is really complaining about is the loss of the competitive advantage that

-15-

could be enjoyed under the Allocable Share Refund provision. The cases cited by International Tobacco in support of its First Amendment argument will not support a claim that the loss of a competitive advantage (as opposed to the imposition of a burden not borne by other tobacco companies) unconstitutionally burdens speech, regardless of whether it is commercial or political in nature. The Court, therefore, concludes that the Motion To Dismiss should be granted as to plaintiff's free speech claim.

5.    Defendant next argues that plaintiff has failed to state a claim upon which relief can be granted pursuant to the Equal Protection Clause of the Fourteenth Amendment. Plaintiff contends that an improper distinction is being made between PMs and NPMs, and couches the issue thus: "The issue is whether an NPM's escrow obligation under Arkansas's statute for sales in Arkansas is financially more burdensome than what its MSA obligation *to Arkansas* for those same cigarettes would have been as a PM." (Plaintiff's Memorandum In Opposition To The Motion To Dismiss, page 28, emphasis in original.)

The Court does not agree that plaintiff has properly framed the issue. As noted in ¶5, the Allocable Share Amendment does not require plaintiff, or any other NPM, to pay more *per cigarette* into escrow than it would pay *per cigarette* under the MSA if it were a PM, although it does - in the case of an NPM operating regionally rather than nationally - require it to pay more into

its Arkansas escrow account than the amount Arkansas would receive as its allocable share of an MSA payment if the NPM were a PM. Plaintiff's attempt to cast the issue in terms of the amount of money Arkansas receives, rather than the amount of money plaintiff pays, does not alter the equal protection analysis, since it is what happens to plaintiff, not what happens to Arkansas, that is at issue. As noted by the Supreme Court:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations - illogical, it may be, and unscientific.

**U.S.R.R. Retirement Board v. Fritz**, **449 U.S. 166, 175, (1980)** (internal citations and quotation marks omitted).

When viewed in terms of the real issue, the Court concludes that plaintiff could prove no set of facts under its Amended Complaint that would prove an equal protection violation. State statutes are presumptively constitutional. **Lemon v. Kurtzman**, **411 U.S. 192 (1973),** citing **San Antonio Independent School District v. Rodriguez**, **411 U.S. 1 (1973).** Statutes dealing with economic issues must pass only a rational basis test to survive constitutional scrutiny. The rational basis test has been articulated by the United States Supreme Court as follows:

Under rational-basis review, where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Moreover, the State need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification.

**Board of Trustees of University of Alabama v. Garrett**, **531 U.S. 356, 367-68 (2001)** (internal citations and quotation marks omitted).

The Court does not believe that plaintiffs can prove any set of facts under which the Allocable Share Amendment would fail the rational basis test. The State clearly has the authority, under its police powers, to protect the health and welfare of its citizens. As evidenced by the Emergency Clause enacted with the Allocable Share Amendment, the State has found that tobacco use poses a threat to the health and welfare of those citizens, i.e., "smoking poses a serious health risk to Arkansans," and that the Allocable Share Amendment was necessary for the effective administration of the MSA, which "is a critical component in reducing the rate of smoking in Arkansas." **Act 384 of 2005, §5.** These provisions of the Emergency Clause reflect a rational relationship between the Amendment and its purpose.

For the foregoing reasons, the Court concludes that

plaintiff's Equal Protection claim should be dismissed.

6.    Defendant next contends that plaintiff has failed to state a claim for deprivation of property without due process of law.   Plaintiff responds that the Amendment violates not only procedural but also substantive due process.   The Court will examine these claims first from the perspective of the Amendment as applied prospectively, and then as to its retroactive application, commencing with the issue of substantive due process.

7.    Before addressing those specific issues, it is necessary to determine whether plaintiff has been deprived of a protected interest in liberty or property.   If so, then the substance and procedure attendant upon that deprivation are examined to see if they comport with due process.   **American Manufacturers Mutual Insurance Co. v. Sullivan**, **526 U.S. 40 (1999).**

Defendant, while not contesting that International Tobacco has a property interest in the funds that must be escrowed under the Allocable Share Amendment, suggests that International Tobacco has not been *deprived* of that property interest, because the money paid into escrow continues to belong to International Tobacco unless and until the State files suit and either prevails at trial or achieves a favorable settlement of its claim.   This argument runs counter to established law.   "[A] temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment."   **Fuentes v. Shevin**, **407 U.S.**

-19-

**67, 84-85 (1972)**. The Court, therefore, finds that International Tobacco has been deprived of an interest in property by the Allocable Share Amendment.

8.    In order to pass substantive due process muster, legislation need only have a rational relationship to a legitimate state objective.  The Due Process Clause "does not empower the judiciary to sit as a superlegislature to weigh the wisdom of legislation." **Exxon Corp. v. Governor of Maryland**, **437 U.S. 117, 124 (1978)** (internal quotation marks omitted).  As explained in ¶7, *supra*, the Court has found a rational relationship between the Allocable Share Amendment and the State's expressed purpose of ensuring effective administration of the MSA, which is a critical component in reducing the rate of smoking in Arkansas.  Thus, as to plaintiff's claim that prospective application of the Allocable Share Amendment violates substantive due process, the Motion To Dismiss will be granted.

9.    Plaintiff contends that retroactive application of the Amendment is qualitatively different from prospective application. It points out that, in 2004 - prior to the enactment of the Allocable Share Amendment, which requires a higher per-cigarette payment than did the Allocable Share Refund provision - it made pricing decisions in light of the Allocable Share Refund provision.  Thus, plaintiff argues, the escrow deposits it has already made are inadequate under the Allocable Share Amendment

and, in fact, the cost to meet the new escrow deposits required under the Allocable Share Refund provision would exceed the revenue generated by its sales during that period of time.

The Supreme Court has long recognized that legislation can legitimately "sweep away settled expectations suddenly and without individualized consideration," and for that reason, "retroactive statutes raise particular concerns." **Landgraf v. USI Film Products**, 511 U.S. 244, 266 (1994). In **Landgraf**, the Supreme Court listed, as being of particular concern, legislative enactments which infringe on constitutional prohibitions against *ex post facto* laws, laws which impair the obligation of contracts, laws which effect takings without just compensation, bills of attainder, and laws which deprive an affected person of due process.

> Absent a violation of one of those specific [constitutional] provisions, the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope. Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary.

**511 U.S. at 267-68.**

Defendant argues that the purpose of the Allocable Share Amendment is "benign," "legitimate," and "meant to 'correct mistakes' resulting from the language of the original

legislation," and that since the Amendment's intent to apply to 2004 escrow deposits is clear, there is no constitutional impediment to such application. As the Supreme Court stated in **Landgraf**, clear intent assures that the legislative body "has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." **511 U.S. at 272-73.**

In **Usery v. Turner Elkhorn Mining Co.**, **428 U.S. 1 (1976)**, the Supreme Court took up a due process challenge to a federal statute which retroactively imposed on mining companies liability for injuries caused to miners by the conditions under which they worked, even in situations where the miners had terminated their employment before the statute was enacted. The Court there noted that

> legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. . . . [L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. . . . This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

**428 U.S. at 15-16.**

However, as explained in the later case of **Pension Benefit Guaranty Corp. v. R.A. Gray & Co.**, **467 U.S. 717, 733 (1984),**

> retroactive legislation does have to meet a burden not faced by legislation that has only future effects. It

does not follow . . . that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former. But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

**467 U.S. at 730** (internal citations and quotation marks omitted).

Given that "retrospective civil legislation may offend due process if it is particularly harsh and oppressive," a standard which does not differ from "the prohibition against arbitrary and irrational legislation," **Pension Benefit**, **467 U.S. at 733**, the Court finds that plaintiff has stated a claim that the retroactive application of the Allocable Share Amendment violates its constitutional right to substantive due process, and the Motion To Dismiss as to that claim will be denied.

10. The Court next examines the procedure used to effect the deprivation of property worked by the Amendment. The fundamentals of procedural due process are, of course, notice and an opportunity to be heard:

For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.

**Hamdi v. Rumsfeld, 542 U.S. 507, 533 (2004)** (citations and internal quotation marks omitted).

-23-

11.  Plaintiff's procedural due process challenge, as to the prospective application of the Amendment, relates to the opportunity to be heard.  Does it occur at a meaningful time, and in a meaningful manner?  Depending upon the circumstances, this right may be fulfilled either before or after a deprivation.  In **Mathews v. Eldridge**, **424 U.S. 319 (1976),** the Supreme Court took up the issue of whether - and under what circumstances - a due process hearing must be held *before* government deprives an individual of property.  The Court there stated that

> identification of the specific dictates of due process generally requires consideration of three distinct factors:  First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

**424 U.S. at 334-35.**

The Court now examines these factors to determine whether it appears that plaintiff could prove facts under which procedural due process would require a pre-deprivation hearing in connection with its escrow payments:

(a)  The affected private interest, in this case, is the sums of money International Tobacco has been, and will in the future be, required to deposit into escrow and leave there for 25 years.  These sums are alleged to be substantial, an allegation

the Court accepts as true in connection with the Motion To Dismiss. The weight of the private interest is offset by several factors, however. The escrowed sums are no greater than the sums that OPMs are required to pay each year for the privilege of selling cigarettes, and NPMs, unlike OPMs, are not giving up ownership of their money. While the escrow deposits are not tax deductible, as are MSA payments, International Tobacco and the other NPMs are compensated for the loss of use of the escrowed funds by the interest that accrues on those funds, and the escrow payment obligation is not coupled with restrictions on speech to which the PMs are subjected. In view of these facts, the Court does not find that the private interest of the NPMs weighs very heavily in the **Mathews** analysis.

(b)  Although plaintiff contends that the risk of an erroneous deprivation is substantial - it alleges that the payments called for under the Amendment are not justified on the basis of any current showing of wrongful conduct on its part nor on the basis of "leveling the playing field" between NPMs and PMs - it does not dispute that its tobacco products, like any other tobacco products, have the potential to cause harm.  This undisputed fact reduces the risk of erroneous deprivation to a point where procedural safeguards - in addition to those attendant upon the litigation that would be necessary before the State could deprive an NPM of ownership of its escrowed funds - would be of

-25-

little benefit.

(c)　The Amendment's Emergency Clause demonstrates the State's interest in this matter:　reduction of smoking, which requires effective administration and enforcement of the MSA.　A pre-termination hearing would entail significant burdens on this interest, as it would require premature litigation of potential claims the State might levy against plaintiff, with the attendant risks of erroneous decision and the expenses and burdens - on both the State and the NPMs - of litigation.

Given the relatively small risk of an erroneous deprivation, the minimal value of additional procedural safeguards, and the State's unquestionable interest in the matter, the Court concludes that plaintiff could prove no set of facts under which a pre-deprivation hearing would be constitutionally required in order for the State to implement the Allocable Share Amendment.

Although the Court concludes that a pre-deprivation hearing is not required, that finding does not completely answer the procedural due process question because, at some point, International Tobacco will be entitled to a hearing if it is to be deprived of ownership of its escrowed funds.

Defendant contends that the available post-deprivation remedy is constitutionally sufficient -- in that International Tobacco will either have the right to release of the escrowed funds (after 25 years) or will have the issue resolved through litigation, with

all its attendant procedural protections.

Plaintiff disagrees and insists that defendant's argument misses the point of its post-deprivation procedural due process contention: that the State can deprive an NPM of the use (although not the actual ownership) of its funds for up to 25 years without any hearing whatsoever.

It is axiomatic that for due process to exist, the right to be heard must come "at a meaningful time." **Fuentes v. Shevin, 407 U.S. 67, 80 (1972).** The Court's research has not disclosed any case in which a 25-year delay between deprivation and remedy has been approved - or even considered. However, the Supreme Court has offered some guidance as to how to evaluate the issue.

In **U.S. v. Eight Thousand Eight Hundred and Fifty Dollars, 461 U.S. 555 (1983),** the Court took up the question of "when a post-seizure delay may become so prolonged that the dispossessed property owner has been deprived of a meaningful hearing at a meaningful time," and approved a framework for determining whether the delay in providing a post-deprivation remedy violated the due process right to be heard at a meaningful time. The Court there said that the four factors to be considered were the same as those supplied in **Barker v. Wingo, Warden, 407 U.S. 514 (1972),** to-wit:

* the length of delay;

* the reason for the delay;

* the property owner's assertion of his rights; and

* prejudice to the property owner.

In this case, as in **U.S. v. Eight Thousand Eight Hundred and Fifty Dollars**, "the overarching factor is the length of the delay." There, the Court considered a delay of some 18 months to be "quite significant," but determined it to be reasonable on the facts of the case. Here, the delay of 25 years is obviously "quite significant." However, the reason given for the delay is also "quite significant" in the Court's view. Smoking-related health problems (and their costs) take years to appear and, thus, the State needs a "quite significant" amount of time to evaluate whether a given NPM is responsible for those costs before taking legal action. Plaintiff does not suggest that the stated reason for the delay is false, nor does it persuasively argue that a lesser period of delay would serve the purpose equally well. Thus, the Court finds that the first two factors weigh in favor of the defendant's position.

The fourth factor, prejudice to the NPMs, also tilts in favor of the defendant. While the NPMs are deprived of the use of their escrowed funds pending the post-deprivation remedy, they are compensated for that loss by receiving interest on those funds. Meanwhile, they are able to conduct their business without restrictions on their speech. In the heavily-regulated tobacco industry, the resulting prejudice to the NPMs, on balance, is small.

The third factor, as made clear in **Barker**, is essentially a consideration of whether the property-owner acquiesces in any delay in obtaining a post-deprivation remedy. Given that plaintiff filed the instant litigation, that factor weighs in its favor. It does not, however, outweigh the other factors in the Court's view.

After careful consideration, the Court believes that application of the **Barker** balancing test yields the conclusion that in the particular circumstances here presented, the post-deprivation remedy (either return of the funds at the end of 25 years or litigation if the right to return is disputed) is constitutionally sufficient. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." **Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy**, 367 U.S. 886 (1961).

12. With regard to plaintiff's allegation that retroactive application of the Amendment violates procedural due process, the Court finds that it has stated a claim based on lack of notice. "Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply," **Texaco, Inc. v. Short**, 454 U.S. 516, 532 (1982). In this case, however, plaintiff did not have, and could not have had, notice of the existence of the Amendment in 2004, because it had not yet been

enacted. The Court finds this allegation sufficient to state a claim for deprivation of procedural due process as to the retroactive application of the Amendment.

**IT IS THEREFORE ORDERED** that **Defendant's Motion To Dismiss** (document #21) is **granted in part and denied in part.**

The motion is **denied** insofar as it seeks dismissal of plaintiff's claims that retroactive application of **A.C.A. §26-57-260-261,** as amended by **Act 384 of 2005,** to plaintiff's escrow deposits for 2004 and the first quarter of 2005 violates substantive and procedural due process.

The motion is **granted** in all other respects.

**IT IS SO ORDERED.**

       **/s/ Jimm Larry Hendren**
      **JIMM LARRY HENDREN**
      **UNITED STATES DISTRICT JUDGE**